Thomas KOSMO, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 04–484C.

United States Court of Federal Claims.

July 25, 2006.

Louis P. Font, Font & Glazer, Brookline, MA, for Plaintiff.

Hillary A. Stern, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC; Lt. Col. P. Christopher Clark, Air Force Legal Services Agency, General Litigation Division, Arlington, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

WILLIAMS, Judge.

Plaintiff, Thomas Kosmo, a retired Colonel in the United States Air Force Reserve (USAFR), seeks relief stemming from his reassignments to Non–Participating and Standby Reserves due to his alleged fraudulent claims for travel reimbursement. Although Plaintiff was exonerated of these charges and an audit determined that the government owed him money for travel reimbursement, the Air Force Board for the Correction of Military Records (AFBCMR) denied Plaintiff's petition for correction of his military record and related relief. Plaintiff claims the AFBCMR acted in an arbitrary and capricious manner by failing to follow the recommendations of a Discharge Board and the Directorate of Personnel Program Management to grant him relief. Plaintiff seeks correction of his record and damages, including back pay, allowances and credits toward retirement, promotions and awards.

This matter comes before the Court on Defendant's motion to dismiss, or in the al-

ternative, for judgment on the administrative record and Plaintiff's motion for judgment on the administrative record. Because this action is time-barred, Defendant's motion to dismiss is granted.[1]

### Background [2]

As of August 1989, Plaintiff was a Colonel in the USAFR.[3] In 1983, the United States Air Force Intelligence Service invited Plaintiff to make an inter-Service branch transfer from the United States Army Reserve (USAR) and become the Air Force Reserve Attache in Bonn, Germany, for service in both Europe and at Headquarters United States Air Force, Directorate of Plans and Operations, Air Force Doctrine and Concepts Division in the Pentagon.[4] Compl. ¶ 14. Plaintiff "linked the Air Staff to counterparts at the Defense Intelligence Agency, Central Intelligence Agency, National Security Agency, and to European military attaches in Washington and in Europe." Compl. ¶ 16. Plaintiff's duties involved extensive travel. Compl. ¶ 17. By the summer of 1984, Plaintiff was stationed at the Pentagon. Compl. ¶ 14.

On or about April 19, 1989, an anonymous complaint was submitted to the Department of Defense Hotline alleging that Plaintiff was a security risk, falsified Air Force forms, and used his official position for personal benefit. AR at 542–44. The sources of this complaint submitted a memorandum regarding Plaintiff, stating in part:

1. The authors of this memorandum regard LTC Kosmo as a dangerous security

hazard. It is our goal to initiate a discreet but very serious investigation of his background, behavior, and contacts in the USSR. There is a slight but real possibility that Kosmo is engaged in espionage against the United States. Even if that suspicion proves groundless, his bizarre personal behavior already warrants loss of security clearance and expulsion from the U.S. Air Force Reserve in our considered professional judgement.

\* \* \*

5. Kosmo has been described as a "pathological liar" by many of his colleagues. He often poses as a regular officer, although he is actually a reserve. He has been caught falsifying several Air Force forms in order to increase his compensation for reserve duty, and he is strongly suspected of falsifying others. Yet he also displays inexplicable wealth. He has made many trips to Europe and one to the USSR for which no clear source of payment exists. His corporation (of which he claims to be the president) seems too small and ill funded to explain his style of life.

AR at 28–29 ¶ ¶ 1, 5.[5]

In July 1989, the Air Force Office of Special Investigations (AFOSI) initiated an investigation of Plaintiff's travel voucher claims. AR at 97. On January 22, 1990, Plaintiff learned, via letter, that he was under investigation by AFOSI, and that his

---

1. As the parties recognized, this Court has jurisdiction under the Tucker Act because 10 U.S.C. § 1331, recodified at 10 U.S.C. § 12731, is a money-mandating statute which would entitle Plaintiff to additional retirement pay if his reassignments were to be corrected. Pl.'s Supp. at 2; Def.'s Resp. to Ct. Order at 4; *see also Fisher v. United States*, 402 F.3d 1167, 1175 (Fed.Cir. 2005). Although Defendant maintained that Plaintiff could not state a claim upon which relief could be granted under Section 1331 because Plaintiff would not reach the age of 60 until June 27, 2006—the age at which an individual is entitled, upon application, to retirement pay pursuant to Section 1331,—this argument has been rendered moot.

2. This background is derived from the Administrative Record (AR) and the appendices to the parties' motion papers.

3. All Reserve manpower is assigned to one of three Reserve categories—the Ready Reserve, Standby Reserve, or Retired Reserve. 10 U.S.C. § 10141(a) (1994). "Reserves who are on the inactive status list of a reserve component ... are in an inactive status. Members in the Retired Reserve are in a retired status. All other Reserves are in active status." 10 U.S.C. § 10141(b). Plaintiff appears to have been in active status at this time.

4. Prior to this time, Plaintiff served as a major in the Army Reserve. Compl. ¶ 4.

5. The authors of this memorandum chose to remain anonymous. AR at 29.

access to classified information was suspended. *Id.*

On May 23, 1990, Plaintiff was notified that he was being involuntarily reassigned to Inactive Reserve Status due to his lack of a security clearance, pending final disposition of the AFOSI investigation. Plaintiff's reassignment meant that he would "be curtailed in performing his normal USAFR duties as an Individual Mobilization Augmentee (IMA)[6] assigned [to] the HQs USAF, Directorate of Plans, Force Assessment Division." AR at 101. On July 6, 1990, the Director of Individual Reserve Programs at the Air Reserve Personnel Center Headquarters issued an order reassigning Plaintiff to the Non–Obligated, Non–Participating Ready Personnel Section (NNRPS) at the Headquarters Air Reserve Personnel Center in Denver, Colorado, effective August 1, 1990, for failure to meet Air Force standards. *Id.* at 102. The NNRPS consisted of:

> officers and enlisted personnel without MSOs [military service obligations] who still qualify for worldwide duty. Officers are assigned to NNRPS when . . . [t]hey are reassigned for failure to meet requirements of participating reserve assignments.

AFR 35–41, Vol. I, Chp. 2–7, at 8–9 (1990). The NNRPS is a Ready Reserve Section.[7] 10 U.S.C. § 10141; AFR 35–41, Vol. I, Chp. 2–7, at 7–8.

**6.** Individual Mobilization Augmentees (IMAs),

> are assigned . . . based on active force wartime manpower requirements. IMAs are usually assigned to active duty organizations and are the primary source of augmentation in an emergency requiring a fast, sizable expansion of the active force. . . . IMAs are usually attached to active duty . . . or USAFR units for inactive duty training (IDT).

Air Force Regulation (AFR) 35–41, Vol. I, Chp. 2–6, at 6–7 (1990).

**7.** Because the NNRPS is part of the Ready Reserve, its members are in active status—which is a term used to describe a category of Reserve officers who are eligible for promotion. 10 U.S.C. § 10141(b) (2000); *Reeves v. United States*, 49 Fed.Cl. 560, 562 n. 3 (2001).

**8.** The minimum Retention/Retirement (R/R) requirements are:

The AFOSI completed its investigation and issued a report on July 17, 1990, concluding that Plaintiff owed the Government $11,022.50 as a result of submitting "false claims" in his travel vouchers. AR at 337–38.

Prior to his August 1, 1990 reassignment, Plaintiff had been "assigned to a point-gaining activity and could have earned points," which determine eligibility for retention in Ready Reserves programs, active reserve status, and retirement.[8] AR at 298. While assigned to NNRPS, Plaintiff was prohibited from "performing considerable active duty for training, gaining pay, allowances, and retirement credit." Compl. ¶ 24; Def.'s Statement of Facts ¶ 8; AR at 102. Specifically, "members [of the USAFR who are assigned to the NNRPS] earn [base] membership points; however, they are not able to take part in point-gaining activities." AR at 298.

On July 29, 1991, the Air Force Accounting and Finance Office demanded that Plaintiff reimburse the Government for travel voucher overpayments, stating in pertinent part:

> [Y]our travel vouchers have been reviewed by several government agencies, including the OSI, IG, JAG and the U.S. Attorney's Office. Their investigations have concluded that you were overpaid $11,022.50 by the United States government for your travel done as a Reservist with the United States Air Force. These overpayments occurred because of your improper comple-

> A member must earn a minimum of 50 points (including membership) for retention in an Active Reserve status and a satisfactory year for retirement.

AFR 35–41, Vol. II, Chp. 2–1, at 7 (1992). Points are awarded as follows:

> Active Duty Points: One [active duty] point is awarded at the end of each tour of duty for each day of IADT [initial active duty for training], AT [annual training], ADT [active duty for training], [or] ADS [active duty support] . . . tour. . . .
> IDT [Inactive Duty Training] Points: One point may be earned for each day when a member participates less than 8 hours in that day. . . . A maximum of two points may be earned for taking part in IDT for 8 or more hours in a single day. . . . Up to 15 points may be credited for Active Reserve status membership for each R/R year. These points may be prorated for a period of less than a year.

*Id.* at Chp. 2–6, at 8.

tion of travel vouchers. This letter requests you to make immediate compensation to the government in the amount of $11,022.50 for these overpayments.

AR at 137. On August 6, 1991, Plaintiff responded to this letter requesting sufficient time to prepare an adequate response. AR at 138.

On or about September 27, 1991, before he had filed an additional response, Plaintiff was reassigned to the Inactive Status List Reserve Section (ISLRS). Compl. ¶ 26. The reason specified for his reassignment was "unsatisfactory participation with over 20 years satisfactory service." AR at 444. The ISLRS includes Standby Reservists [9] who are not required to remain in an active program and "cannot participate in prescribed training." 10 U.S.C. § 10152 (1994). Inactive Status List members may not train for points or pay, and are not eligible for promotion. 10 U.S.C. § § 10152, 10153 (1994); Manual 36–8001, Chp. 2.1, at 18. "Service in the ISLRS is not considered Federal service in determining entitlement to retired pay." Compl. ¶ 26; AR at 298. Once Plaintiff was reassigned to ISLRS, he no longer trained for points or pay and was no longer eligible for promotion.

On November 4, 1991, Plaintiff notified the Accounting and Finance Office of his intent to appeal the validity of the alleged debt and indicated that he would file his appeal package within 90 days or as soon as he received the AFOSI Report of Investigation pursuant to a Freedom of Information Act request. AR at 145.

On or about January 28, 1992, Plaintiff was informed that the Commander of the Air Reserve Personnel Center had initiated a discharge action against him on the ground that he had defrauded the Government of $11,022.50, the overpayment for his travel. AR at 146.

On March 29, 1993, an Air Force Discharge Board comprised of three Brigadier Generals convened to determine whether Plaintiff should be discharged from the USAFR.[10] After two days of deliberations, the Discharge Board determined that while Plaintiff did not willfully attempt to defraud the Government, he did not "fulfill his responsibilities as a Reserve officer to be knowledgeable of Joint Travel Regulations and Air Force Regulations as they pertain to his Air Force duty." AR at 468. The Discharge Board recommended that the Air Force retain Plaintiff in its Reserve and that the "appropriate authority direct [Plaintiff] to reaccomplish all his travel vouchers for the period on or about 23 April 1987 to 15 July 1989 with the assistance of competent authority and pay all monies due to the U.S. Government." *Id.* at 468.

Thereafter, the Defense Finance and Accounting Office (DFAO) conducted an audit and issued a memorandum on June 29, 1993, concluding that Plaintiff "did not willfully attempt to defraud the U.S. Government for allegedly receiving travel entitlements and reimbursements for which he was not entitled." AR at 159. In fact, on July 9, 1993, the DFAO issued a memorandum concluding that the Air Force owed Plaintiff $3,265.50 for past travel expenses, and the Air Force subsequently repaid Plaintiff this amount. *Id.* at 532; Compl. ¶ 37.

On July 23, 1993, Plaintiff filed an initial complaint with the Office of Inspector General for the Department of the Air Force (AF OIG). In a letter dated August 6, 1993, the AF OIG acknowledged receipt of the initial complaint and advised Plaintiff that it was "awaiting additional information from [him] before determin[ing] a specific course of action." AR at 11.

---

9. "The Standby Reserve is made up of [the] NARS [nonaffiliated reserve section] and ISLRS [inactive status list reserve section]." AFR 35–41, Vol. I, Chp. 2–8, at 9. The ISLRS is "the inactive Standby Reserve." *Id.*

10. The Discharge Board is appointed by authority of the Secretary of the Air Force and consists of at least three voting members who must be "experienced, unbiased persons of mature judg-

ment." AFI 36–3208, at Chp. 3–24, 3–25, at 20. "The board shall make its findings and recommendations based on those presented at the board hearing [and] ... must reach clear, logical findings of fact as to each allegation set out in the notification memorandum.... On the basis of its findings, the board recommends one or more actions to be taken in the case." *Id.*, Chp. 8, at 167.

On November 2, 1993, Plaintiff received a letter stating that his debt had been cancelled. AR at 188.

On December 27, 1995, Plaintiff filed a formal complaint with AF OIG "concerning [the] violation of [his] due process rights and [the] abuse of authority by Air Force members." AR at 12.

On December 16, 1996, the AF OIG responded as follows:

This is in response to your December 27, 1995 complaint to the Air Force Inspector General concerning violation of your due process rights and abuse of authority by Air Force members. We've completed our investigation and determined that this matter is best served via an appeal to the Air Force Board for Correction of Military Records (AFBCMR) and/or the civilian court system.

You allege that your rights of due process were violated which caused a six year interruption in your career. This was allegedly due to abuse of authority by other Air Force members when they filed a complaint against you. We note from your file that a discharge board exonerated you of all charges related to the complaint. While it may seem unfair to you that your career be interrupted due to this process, it was necessary to process the original complaint against you. Since the discharge board found in your favor, you should seek redress through the AFBCMR.

The AFBCMR is the highest echelon of administrative appeal within the Air Force and is empowered to make such recommendations to the Secretary of the Air Force, as deemed appropriate. Application to the AFBCMR is accomplished by submitting a DD Form 149, *Application for Correction of Military* Record to [the] ... Air Force Board Correction Military Record....

The AFBCMR considers each case based on the evidence submitted by the petitioner and the final determination is based on the data submitted. Should you desire redress for the allegedly slanderous remarks, you should seek legal counsel and consider filing suit in civil court. The In-

spector General System is not the appropriate forum for these issues.

AR at 12–13 (emphasis in original).

Some eleven months later, on November 27, 1997, Plaintiff filed a petition with the AFBCMR requesting "[t]o be made whole for unjust six-year interruption of career in Air Force Reserve during dates 23 May 1990–16 December 1996." AR at 8. Plaintiff argued:

[S]everal individuals abused their official positions in and several institutions of the United States Air Force and deliberately violated the legal rights of Colonel Thomas Kosmo....

[T]hese individuals were a small anonymous group of USAF Reserve and Intelligence officers who were assigned to positions where they could and did manipulate Air Force institutions to secure Colonel Kosmo's "expulsion from the U.S. Air Force Reserve."

. . . .

[T]he anonymous writers of the Hotline Case expected Colonel Kosmo to be worn down and overwhelmed by all these agencies, and ... they acted in an official capacity when they knowingly violated legal due process. Their actions effectively terminated the Reserve Officer's career.

*Id.* at 26.

The Directorate of Personnel Program Management (ARPC/DP) reviewed Plaintiff's application to the AFBCMR and submitted its own brief to the AFBCMR. On March 25, 1998, the ARPC/DP recommended to the AFBCMR that Plaintiff's request be approved, stating:

Since the administrative discharge board recommended retention and the finance officials determined he did not defraud the United States Government, it follows that the reassignment to a nonparticipating status had a derogatory effect on the applicant's career. Recommend the applicant's request be approved.

AR at 195. Based on its findings, the ARPC/DP recommended revoking both the Reserve Order (RO) of July 6, 1990, reassigning Plaintiff to the Non-obligated Non-

participating Ready Personnel Section, and the RO October 10, 1991, reassigning Plaintiff to the Inactive Status List Reserve Section. *Id.* at 195. In addition, the ARPC/DP recommended restoring additional inactive duty training points and membership points to Plaintiff as well as crediting him with satisfactory years toward retirement for the retirement year ending March 2, 1991 through the partial retirement year March 3, 1996–December 16, 1996.[11]

On July 7, 1998, Plaintiff filed his response to the ARPC/DP advisory opinion, arguing that he was entitled to additional training points, awards and promotions. AR at 198–204.

On October 14, 1998, the ARPC/DP issued a second advisory opinion recommending that additional points be restored to Plaintiff. *Id.* at 298–300. The ARPC/DP determined that Plaintiff "was assigned to a point-gaining activity and could have earned points until 1 August 1990" and therefore, calculated lost points from "1 August 1990, the date [Plaintiff] was assigned to the NNRPS, to 16 December 1996." *Id.* at 298. The ARPC/DP further stated that Plaintiff would have to submit a request to the Secretary of the Air Force through a member of Congress for award of the Legion of Merit and applicable unit decorations and that Plaintiff's request for a promotion would have to be referred to USAFR Headquarters for an advisory opinion. *Id.* at 300.

On November 27, 1998, Plaintiff filed a response again asserting that he was entitled to awards and promotions. AR at 303–08.

On April 1, 2000, Plaintiff was assigned to the Retired Reserve Awaiting Pay, to await receiving retirement pay until reaching the age of 60.[12]

On June 5, 2000, Major General James E. Sherrard III, Chief of Air Force Reserve (AF/RE), issued an advisory opinion addressing the promotion Plaintiff requested in his application to the AFBCMR on November 27, 1997. AR at 309. The memorandum stated that "it is unlikely [Plaintiff] would have been competitive for nomination to a general officer position, and, therefore, would not have been eligible to compete for promotion." *Id.* In a response dated July 5, 2000, Plaintiff questioned Major General Sherrard's impartiality and alleged that AF/RE tried to "slow roll" its Advisory Opinion, delaying submitting the opinion to the AFBCMR for 18 months without justification, losing Plaintiff's AFBCMR's package and ignoring the AFBCMR's suspense dates. *Id.* at 314. Plaintiff further argued that AF/RE "decided in December 1998 'to close ranks' with one of its own targeted in the AFBCMR case. This is ... possibly the only reason that AF/RE 'lost the package' in December 1998, and then delayed composing its Advisory Opinion for as long as possible." *Id.* Finally, Plaintiff questioned why AF/RE's conclusion that Plaintiff would not likely have been competitive for promotion had no support and did not reference his job performance or qualifications. *Id.* at 314–15.

On August 30, 2000, the AFBCMR denied Plaintiff's application. AR at 7. On February 25, 2002, Plaintiff submitted additional documentation to the AFBCMR for reconsideration and requested a personal appearance, but the AFBCMR did not grant this request.[13]

---

**11.** The record does not indicate how the lost points translate into lost pay, retirement pay and allowances. It appears that the requested restoration of points would credit Plaintiff with additional years of satisfactory Federal service toward retirement, thus increasing his retirement pay. In addition, it appears that Plaintiff contends that he would have received active duty pay or IDT pay absent the reassignment.

**12.** On the 30th anniversary of his first commissioning, an officer in inactive reserve status must take affirmative action to transfer to retired status or be discharged from military service. 10 U.S.C. § 14507(b) (2000); 10 U.S.C. § 14514 (2000). Plaintiff was first commissioned on March 3, 1970. Compl. ¶ 5. Since Plaintiff was in inactive service on his 30th anniversary on March 3, 2000, he was forced to take affirmative steps to be transferred into retired service. Def.'s Supp.App. at 1. Plaintiff's mandatory separation date was April 1, 2000, unless he applied for transfer to the Retired Reserve. Pl.'s App. at 6. Plaintiff was eligible to begin collecting his benefits when he reached the age of 60 on June 27, 2006. Pl.'s Supp. Br. at 7.

**13.** Plaintiff said that the almost two-year delay in submitting additional documentation to the AFBCMR stemmed from his need to obtain materials pursuant to the Freedom of Information Act.

On October 4, 2002, the AFBCMR denied Plaintiff's application on reconsideration, stating:

> Notwithstanding the fact that an administrative discharge [board] found that the applicant did not willfully attempt to defraud the government of reimbursement for which he was not entitled and recommended that he be retained in the Air Force Reserve, it did find that he knowingly submitted inaccurate claims ... and [that] he did not fulfil [sic] his responsibilities as a Reserve officer.... [G]iven the concerns regarding his travel vouchers, the investigation of the [Plaintiff] for travel voucher fraud was warranted. We also believe that given the seriousness of the allegations against the [Plaintiff], his reassignment was appropriate and within the commander's discretionary authority, and that the time it took to ultimately resolve this matter was sufficiently justified. In our view, the delay in the [Plaintiff's] career was substantially caused by his own actions.

AR at 324.

Plaintiff filed this action on March 26, 2004.

### Discussion

In the Court of Federal Claims (COFC), the statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *MacLean v. United States*, 454 F.3d 1334, 1336, 2006 WL 1897047, at *2 (Fed.Cir.2006), *quoting Hopland Band of*

*Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988) (citations omitted).

According to 28 U.S.C. § 2501, a suit must be filed in COFC within six years of the date on which the claim first accrues. In a Tucker Act suit, claim first accrues within the meaning of the statute of limitations "when all the events have occurred which fix the liability of the Government and entitle the [Plaintiff] to institute an action." *Brighton Village Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed.Cir.1995) (quoting *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir.1988)); *see also Martinez v. United States*, 333 F.3d 1295, 1303 (Fed.Cir.2003) (en banc), *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1404, 158 L.Ed.2d 76 (2004). In military pay cases, "the date of accrual ... is the date on which the service member was denied the pay to which he claims entitlement." *Martinez*, 333 F.3d at 1313–14. Defendant posits that Plaintiff's cause of action accrued at the earliest on January 22, 1990, when the Special Security File[14] was established on Plaintiff, or, at the latest, on September 27, 1991, when he was reassigned to the ISLRS. On the record before the Court, it is difficult to pinpoint the date on which Plaintiff first lost pay or suffered monetary damages. As best the Court can cipher, this appears to have occurred on the effective date of Plaintiff's involuntary reassignment to NNRPS on August 1, 1990, when Plaintiff was prevented from "performing considerable active duty for training" thereby losing pay, allowances, and retirement credit.[15]

---

Compl. ¶ 59.

AFI 36–2603 provides that the AFBCMR "in its sole discretion determines whether to grant a hearing. Applicants do not have a right to a hearing before the Board." AFI 36–2603, Chp. 4.4 at 4.

**14.** It does not appear that Plaintiff suffered any monetary losses by virtue of the Special Security File being opened.

**15.** Plaintiff alleged:

On or about August 1, 1990 plaintiff was ordered out of his reserve assignment and was involuntarily reassigned to the Non–Obligated, Non-participating Ready Personnel Section (NNRPS). While assigned to NNRPS, Air Force members earn membership points; however, they are not able to take part in

point-gaining activities. This was the beginning of the period in plaintiff's reserve career when he would have continued performing considerable active duty for training, gaining pay, allowances, and retirement credit, had he not been involuntarily reassigned.

Compl. ¶ 24. It thus appears that at the very least Plaintiff was performing less active duty for pay due to this reassignment, and was prevented from earning points which would count toward calculating retirement pay. Stated differently, it appears that a loss of points meant a loss of years of satisfactory service to be credited toward retirement pay. Further, the ARPC/DP, in reviewing Plaintiff's record, calculated that beginning August 1, 1990,—the date on which Plaintiff was assigned to the NNRPS—Plaintiff began losing pay and allowances because he was no longer

In *Martinez*, the Court held that the date Plaintiff forfeited two months pay as a result of a guilty verdict entered against him in an Article 15 proceeding was the date on which his claim for such forfeited pay accrued, not some six months later when he was discharged. 333 F.3d at 1300–01 ("The claim for forfeited pay accrued on August 9, 1991 ... because that was the date on which the pay was forfeited as a result of the Article 15 proceeding, and thus was the date on which the injury incurred."); *cf. Upton v. United States*, 132 Ct.Cl. 355, 131 F.Supp. 518, 518–19 (1955) (finding that the civilian employee's action for difference in wages due to demotion accrued on the date he was demoted); *O'Brien v. United States*, 130 Ct.Cl. 713, 128 F.Supp. 384, 385 (1955) (finding that a claim for pay resulting from an alleged improper reinstatement at a lower grade accrued at the time of the reinstatement); *Adams v. United States*, 46 Fed.Cl. 834, 838 (2000) (finding that the plaintiff's claim for lost earnings, based on the government's alleged failure to pay the plaintiff's education benefits, accrued "at the time the [government] *should* have given him his education benefits but neglected to do so") (emphasis in original). Similarly, in the instant case, Plaintiff's claims accrued on the date Plaintiff's ability to earn pay and points ceased or lessened as a result of his reassignment to the NNRPS, when he was prohibited from performing active duty for training or earning points, causing him to lose pay, allowances, and retirement credit. Alternatively, at the latest, Plaintiff's cause of action accrued on June 27, 1991, when he was reassigned to ISLRS and was unable to train for points or pay, was ineligible for promotion and was not considered to be in federal service for purposes of retirement benefits. In any event, because Plaintiff did not file this Complaint until March 26, 2004, 11 years or more after the cause of action as to either reassignment accrued, the statute of limitations bars his claims.

■ Nor are Plaintiff's claims continuing. A "claim for back pay is not a 'continuing claim' that accrues each time a payment would be due throughout the period that the allowed to participate in point-gaining activities.

service member would have remained on active duty." *Martinez*, 333 F.3d at 1303. Here, the reassignment causing a loss of pay triggered the statute of limitations and did not involve a series of independent, distinct wrongs. *See Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1457 (Fed.Cir.1997); *Wells v. United States*, 420 F.3d 1343, 1345–46 (Fed.Cir.2005).

■ Plaintiff argues that the limitations period began to run when the AFBCMR issued its second decision on October 4, 2002, denying Plaintiff's application. Pl.'s Opp. at 12. However, the Federal Circuit in *Martinez* and *MacLean* squarely rejected the identical argument. The *Martinez* Court explained:

> This court and the Court of Claims have frequently addressed and rejected the argument that the cause of action for unlawful discharge does not accrue until the service member seeks relief from a correction board and the correction board enters a final decision denying relief. *Hurick*, 782 F.2d at 987; *Heisig v. United States*, 719 F.2d 1153, 1155 (Fed.Cir.1983); *Bonen*, 666 F.2d at 539; *Eurell v. United States*, 215 Ct.Cl. 273, 566 F.2d 1146, 1148 (1977); *Homcy v. United States*, 210 Ct.Cl. 332, 536 F.2d 360, 363 (1976); *Mathis*, 391 F.2d at 939; *Friedman v. United States*, 159 Ct.Cl. 1, 310 F.2d 381, 396 (1962); *Lipp v. United States*, 157 Ct.Cl. 197, 301 F.2d 674, 675 (1962). The reasoning underlying that line of cases is that, since their creation, the correction boards have been regarded as a permissive administrative remedy and that an application to a correction board is therefore not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge. *Richey v. United States*, 322 F.3d 1317, 1325 (Fed. Cir.2003); *Heisig*, 719 F.2d at 1155 ("[A]lthough relief has usually been first sought from military correction boards since their creation in 1946, there is here no requirement of exhaustion of administrative remedies prior to pursuit of judicial review."). Accordingly, the failure to seek relief from a correction board not only does not prevent the plaintiff from suing immediately,

AR at 298.

but also does not prevent the cause of action from accruing. *Id.* at 1304. The Federal Circuit recently applied this rationale in *MacLean*, quoting *Martinez's* holding as follows:

[A] Tucker Act action for money accrues when the claimant has exhausted all mandatory administrative remedies, and it does not 're-accrue' if and when the claimant subsequently seeks to exercise any optional administrative remedy, including the remedy of application to a correction board. *Martinez* at 1315.

454 F.3d 1334, 1337, 2006 WL 1897047, at *3 (Fed.Cir.2006) (quoting *Martinez*, 333 F.3d at 1315). As such, Plaintiff's cause of action here accrued when he was first deprived of the ability to earn the pay and points that are the subject of the action—on August 1, 1990, or June 27, 1991,—not in 2004 when the AFBCMR denied his application.

Plaintiff also argues that his cause of action did not accrue at the time of his reassignment to NNRPS on August 1, 1990, or to ISLRS on September 27, 1991, because these actions "[were] accomplished in contemplation of future discharge action." Pl.'s Resp. at 3–4. Because the discharge action was a mandatory administrative proceeding, Plaintiff maintains that his claim could not have accrued until at least March 31, 1993, upon the conclusion of those proceedings. Pl.'s Opp. at 10–11.[16] Aside from the fact that Plaintiff has not established that these reassignments were precursors to discharge, the reassignments were actionable in and of themselves to the extent they carried with them monetary injury when they occurred. Plaintiff was first prevented from earning points and pay as of the date of his reassignment to NNRPS, or at the latest to ISLRS, not when the discharge proceeding ran its course.

In the alternative, Plaintiff argues that if his claims are time-barred, the limitations period should be equitably tolled because the Air Force tricked or induced him into allowing the filing deadline to pass by telling Plaintiff his remedy was to file an application with the AFBCMR. Pl.'s Opp. at 13. Plaintiff relies on the December 16, 1996 AF OIG letter which states: "[s]ince the discharge board found in your favor, you should seek redress through the AFBCMR." AR 12–13. Plaintiff also argues that neither the AF OIG nor the AFBCMR informed him that he had a limited period of time to file suit in the COFC. Pl.'s Opp. at 13.

Although equitable tolling is available in some actions against federal entities, the Federal Circuit has not decided whether Congress intended equitable tolling to apply to Section 2501. *MacLean*, 454 F.3d at 1339, 2006 WL 1897047, at *7; *Martinez*, 333 F.3d at 1316 (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)); *Wells v. United States*, 420 F.3d 1343, 1347 (Fed.Cir.2005) (declining to decide the question of equitable tolling under section 2501 because the plaintiff had not made a sufficient factual showing to invoke equitable tolling). Similarly, even assuming that equitable tolling could be applied against the government under Section 2501, Plaintiff has not satisfied the requisites for invoking equitable tolling here. It is well established that equitable tolling must be strictly construed. *Irwin*, 498 U.S. at 96, 111 S.Ct. 453 (Federal courts have typically applied equitable tolling only sparingly); *Martinez*, 333 F.3d at 1318 ("[E]quitable tolling against the federal government is a narrow doctrine.").

The Court will invoke equitable tolling when a plaintiff has actively pursued his judicial remedies by filing a defective pleading during the statutory period, been induced or tricked by his adversary's misconduct into allowing the filing date to pass or missed the filing date due to the government's concealment of the facts. *Irwin*, 498 U.S. at 96, 111 S.Ct. 453; *Santana–Venegas v. Principi*, 314 F.3d 1293, 1296 (Fed.Cir. 2002). Further, a plaintiff must show "reasonable diligence" himself in order to assert equitable tolling. *Irwin*, 498 U.S. at 96, 111 S.Ct. 453; *MacLean*, 454 F.3d at 1339, 2006

16. Of course, if Plaintiff's cause of action accrued on March 31, 1993, this action would still be time-barred, since the statute of limitations would have run in 1999 over five years before he filed this suit.

WL 1897047, at *5; *Martinez,* 333 F.3d at 1315–16.

 Plaintiff has not demonstrated either a compelling justification for his delay, or that he acted with reasonable diligence. Plaintiff was fully aware that he was not able to earn pay or participate in point-gaining activities as of his reassignment on August 1, 1990, or, at the latest, June 27, 1991, so the Government cannot be said to have concealed these facts from Plaintiff. Nor did the letter from the OIG on which Plaintiff relies, induce, mislead or trick Plaintiff into delaying bringing suit in this Court. Rather, the letter merely advised Plaintiff that the OIG could not give him the relief he sought and suggested the AFBCMR as an alternative forum without advising that he forego or delay a court action. In fact, the letter advised Plaintiff "we've ... determined that this matter is best served via an appeal to the [AFBCMR] *and/or* the civilian court system." AR at 12 (emphasis added).[17] This does not approach the requisite standard for applying equitable tolling—a defendant actively misleading or preventing the Plaintiff from asserting his rights. As the Third Circuit stated:

> The tolling exception is not an open-ended invitation to the courts to disregard limitations periods simply because they bar what may be an otherwise meritorious cause.

*Sch. Dt. of the City of Allentown v. Marshall,* 657 F.2d 16, 20 (3rd Cir.1981).[18]

### Conclusion

Because this action is time-barred, Defendant's motion to dismiss for lack of subject-matter jurisdiction is **GRANTED.**

17. The letter later specified that Plaintiff should seek redress through the AFBCMR since the Discharge Board found in his favor and "seek legal counsel and consider filing suit in civil court" to redress the alleged slander. AR at 12–13.

18. Furthermore, Plaintiff cites the OIG's letter dated December 16, 1996, as the occurrence which misled him into filing with the AFBCMR. Pl.'s Resp. at 4. However, that letter was issued

The Clerk is directed to dismiss this action. No costs.

to Plaintiff *after* the statute of limitations had run as to the NNPRS reassignment, so it cannot have operated to toll the statute if that is when his cause of action accrued. The six-year statute would have run on August 1, 1996, if the reassignment to NNPRS triggered the statute of limitations. As the Federal Circuit recognized in *MacLean,* the doctrine of tolling cannot apply when the statute of limitations has already run and there is nothing to toll. 454 F.3d at 1336, 2006 WL 1897047 at *2.