# United States Court of Appeals for the Federal Circuit

———————————

**BOAZ HOUSING AUTHORITY, ET AL.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2019-2325

———————————

Appeal from the United States Court of Federal Claims in No. 1:17-cv-01797-EDK, Judge Elaine Kaplan.

———————————

Decided: April 16, 2021

———————————

CARL COAN, III, Coan & Lyons, Washington, DC, for plaintiffs-appellees.

ANNA BONDURANT ELEY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellant. Also represented by JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

———————————

Before NEWMAN, O'MALLEY, and WALLACH, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

The government appeals from a decision of the United States Court of Federal Claims ("Claims Court") denying its motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. *See Boaz Hous. Auth. v. United States*, 141 Fed. Cl. 74 (2018). For the reasons explained below, we affirm.

## I. BACKGROUND

### A. The Statutory Framework

Section 9 of the United States Housing Act of 1937 ("Housing Act") provides two funds for public housing: the Capital Fund and the Operating Fund. 42 U.S.C. § 1437g; *see* Quality Housing and Work Responsibility Act of 1998, Pub. L. No. 105–276, 112 Stat. 2461, 2518, 2551–62. The purpose of the Capital Fund is to make assistance available for carrying out "capital and management activities," *e.g.*, the redesign, reconstruction, and reconfiguration of public housing sites and buildings. *See* 42 U.S.C. § 1437g(d)(1). The purpose of the Operating Fund is to make assistance available for "the operation and management of public housing," *e.g.*, activities to ensure a program of routine preventative maintenance, the costs of insurance, and energy costs associated with public housing units. *See id.* § 1437g(e)(1).

Congress tasked the United States Department of Housing and Urban Development ("HUD") with allocating amounts in the Capital Fund and Operating Fund to eligible public housing agencies. *See id.* § 1437g(c)(1). *See generally id.* § 1437a(b)(8). Public housing agencies ("PHAs") include "any State, county, municipality, or other government entity or public body (or agency or instrumentality thereof)" that "is authorized to engage in or assist in the development or operation of public housing." *Id.*

§ 1437a(b)(6).  Each fiscal year, HUD allocates money from the Capital Fund and Operating Fund to PHAs using a multi-factored formula.  *See id.* § 1437g(c)(1), (d)(2), (e)(2); *see also* 24 C.F.R. §§ 905.400, 990.110.  HUD regulations refer to a PHA's yearly amount of assistance from the Operating Fund as its "operating subsidy."  *See* 24 C.F.R. § 990.115.

Section 9 of the Housing Act constrains the ways in which PHAs may use their operating subsidy.  First, except for certain qualifying small PHAs that enjoy total fungibility between their Capital Fund and Operating Fund amounts, PHAs may use no more than 20% of their operating subsidy for Capital Fund uses.[1]  *See* 42 U.S.C. § 1437g(g)(1)(B), (g)(2).  Second, with some exceptions, PHAs may not use any of their operating subsidy "for the purpose of constructing any public housing unit, if such construction would result in a net increase from the number of public housing units owned, assisted, or operated by the public housing agency on October 1, 1999."  *Id.* § 1437g(g)(3).  And third, through appropriations acts, Congress has forbidden paying to PHAs any amount appropriated under the heading "Public Housing Operating Fund" for the costs of operation and management of public housing of any prior year.  *See, e.g.*, Consolidated

---

[1]     Congress authorized this limited fungibility in the Housing Opportunity Through Modernization Act of 2016, Pub. L. No. 114–201, 130 Stat. 782, 802.  Prior to this law, non-small PHAs could not use any portion of their operating subsidy for Capital Fund uses.  *Public Housing Operating Fund:  2015 Summary Statement and Initiatives*, Section of *FY2015 Congressional Justifications*, U.S. Dep't of Hous. & Urb. Dev. J-14, https://www.hud.gov/sites/documents/FY15CJ_PH_OPFND.PDF (last visited Apr. 16, 2021).

Appropriations Act, 2010, Pub. L. No. 111–117, 123 Stat. 3034, 3080 (2009); *see also* 42 U.S.C. § 1437g note.

Finally, the Housing Act authorizes HUD to sanction a PHA that receives assistance under Section 9 of the Housing Act if HUD finds that the PHA "has failed to comply substantially with any provision of this chapter relating to the public housing program." *See* 42 U.S.C. § 1437d(j)(4). Potential sanctions include terminating, withholding, reducing, or limiting the PHA's assistance payments under Section 9 and ordering other corrective action against the PHA. *Id.*

### B.  The PHAs' Breach of Contract Claim

Each of the 553 PHAs in this case executed an Annual Contributions Contract ("ACC") with HUD.  HUD regulations define an ACC as "a contract prescribed by HUD for loans and contributions, which may be in the form of operating subsidy, whereby HUD agrees to provide financial assistance and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects." *See* 24 C.F.R. § 990.115.

HUD's definition comports with the terms of HUD's standard form "Consolidated Annual Contributions Contract Between Housing Authority and the United States of America." *See* J.A. 124–38.  The contract requires HUD to "provide annual contributions to the [PHA] in accordance with all applicable statutes, executive orders, regulations, and this ACC." J.A. 128.  It also requires the PHA to "develop and operate all projects covered by this ACC in compliance with all the provisions of this ACC and all applicable statutes, executive orders, and regulations issued by HUD, as they shall be amended from time to time." J.A. 129.

The standard form ACC also incorporates by reference HUD's regulations contained in Title 24 of the Code of Federal Regulations.  *See* J.A. 127, 129.  Relevant to this

appeal is 24 C.F.R. § 990.210(c), which provides HUD with "discretion to revise, on a pro rata basis, the amounts of operating subsidy to be paid to PHAs" where "insufficient funds are available." 24 C.F.R. § 990.210(c).

In 2012, Congress made insufficient funds available when it funded only approximately 80% of the total operating subsidies of all PHAs (the plaintiffs here and others). *See* Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112–55, 125 Stat. 552, 680 (2011). Congress also directed HUD to "take into account public housing agencies' excess operating fund reserves, as determined by the Secretary," in determining their 2012 operating subsidy. *Id.* As instructed, HUD considered the excess reserves of each PHA when it apportioned the available funding and did not prorate the available funding as required by 24 C.F.R. § 990.210(c) and the ACCs. Some PHAs therefore received more funding in 2012 than they would have if HUD prorated the available funding. Other PHAs, including all the PHAs in this case, received less than they would have or received no funding at all.

The PHAs in this case brought suit in the Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1), alleging that HUD breached their ACCs when it reduced their 2012 operating subsidy on a non-pro rata basis. J.A. 105, 121 (¶¶ 15, 81). The PHAs sought compensatory damages for "the difference between the amounts they should have received under their ACCs and the amounts they actually received." J.A. 119–20 (¶ 71); *see* J.A. 121 (Prayer for Relief).

The PHAs moved for summary judgment as to liability, and the government moved to dismiss pursuant to Rule 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). The Claims Court stayed further briefing on the PHAs' motion for summary judgment pending resolution of the government's motion to dismiss. As to jurisdiction, the government argued that the allegedly breached provisions of the ACCs did not mandate an award

of money damages in the event of breach because the true nature of the PHAs' claim is the violation of a regulation that implements a non-money mandating statutory scheme. According to the government, the statutory scheme was not money-mandating because it attached strings to the PHAs' use of their operating subsidies. As to the merits, the government similarly argued that the PHAs were not entitled to an unrestricted money judgment under any law or contract with HUD.

The Claims Court denied the government's motion to dismiss. The Claims Court first concluded that the PHAs' claim was contract-based because contractual provisions that "were required by and incorporated governing regulations" are not "any less contractual obligations or provisions." *Boaz*, 141 Fed. Cl. at 80 (quoting *San Juan City Coll. v. United States*, 391 F.3d 1357, 1360 (Fed. Cir. 2004)). The court found that "the essential purpose of the ACCs is to contractually obligate HUD to pay monetary subsidies to Plaintiffs in exchange for their operation of public housing projects in accordance with regulatory and statutory requirements." *Id.* at 82. The Claims Court then held that the "strings-attached" nature of the operating subsidy did not preclude the court from exercising Tucker Act jurisdiction over the PHAs' claim. *Id.* The court distinguished both *Lummi Tribe of the Lummi Reservation v. United States*, 870 F.3d 1313 (Fed. Cir. 2017), and *National Center for Manufacturing Sciences v. United States* (*NCMS*), 114 F.3d 196 (Fed. Cir. 1997), because (1) the PHAs sought compensatory damages for their losses from the government's failure to meet a past-due obligation and not equitable relief to enforce a regulatory obligation and (2) the PHAs' claim is based on a breach of contract and not a statute. *Boaz*, 141 Fed. Cl. at 83–84.

After the Claims Court denied its motion to dismiss, the government did not oppose the PHAs' motion for summary judgment on liability in light of *Public Housing Authorities Directors Ass'n v. United States* (*PHADA*), 130

Fed. Cl. 522 (2017), but reserved its right to appeal the Claims Court's judgment.[2]  The Claims Court granted the PHAs summary judgment on liability for the reasons set forth in *PHADA*, and the parties subsequently stipulated to damages with respect to all but one of the PHAs in this case.[3]

On June 25, 2019, the Claims Court entered judgment pursuant to Rule 54(b) of the RCFC.  The government timely appealed to this court.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II.  DISCUSSION

### A.  Standard of Review

We review the denial of a motion to dismiss for lack of jurisdiction *de novo*.  *Inter-Tribal Council of Ariz., Inc. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020).  We also review the denial of a motion to dismiss for failure to state a claim *de novo*.  *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1150 (Fed. Cir. 2014).

### B.  Rule 12(b)(1)

Under the Tucker Act, the Claims Court has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  The Tucker Act is only a jurisdictional statute and "does not create *any* substantive right enforceable against the United States for

---

[2]    In *PHADA*, the Claims Court held that the government breached its obligations under its ACCs with other PHAs by reducing their operating subsidy on a non-pro rata basis.  130 Fed. Cl. at 525, 536.

[3]    The parties have since resolved their dispute about the last PHA.

money damages." *N.Y. & Presbyterian Hosp. v. United States*, 881 F.3d 877, 881 (Fed. Cir. 2018). A plaintiff must therefore identify a separate source of substantive law that creates the right to money damages. *Id.* In the parlance of Tucker Act cases, that source must be "money-mandating." *Lummi*, 870 F.3d at 1317.

In their discussions of the money-mandating requirement, the Supreme Court and this court have distinguished between claims based on the Constitution, a statute, or a regulation and claims based on a contract. *See Holmes v. United States*, 657 F.3d 1303, 1313–14 (Fed. Cir. 2011) (summarizing cases). For claims founded upon the Constitution, a statute, or a regulation, "a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 218 (1983). But for claims founded upon a contract, "there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Holmes*, 657 F.3d at 1314 (quoting *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001)). This presumption normally satisfies the money-mandating requirement for Tucker Act jurisdiction, "with no further inquiry being necessary." *Id.*

This distinction between contracts and other sources of substantive law is logical. *See id.* "[D]amages are always the default remedy for breach of contract." *United States v. Winstar Corp.*, 518 U.S. 839, 885 & n.30 (1996) (plurality opinion) (citing, *e.g.*, Restatement (Second) of Contracts § 346 cmt. a (Am. L. Inst. 1981)). And "[n]ormally contracts do not contain provisions specifying the basis for the award of damages in case of breach, with the exception of provisions governing damages in particular situations, such as liquidated damages for delay or other specified breaches." *San Juan*, 391 F.3d at 1361; *accord Holmes*, 657 F.3d at 1314.

It is true that the existence of a contract does not always mean that Tucker Act jurisdiction exists. *Holmes*, 657 F.3d at 1314; *see Kania v. United States*, 227 Ct. Cl. 458, 464 (1981). We have recognized that three types of contracts are exempt from the presumption that damages are available upon the breach of a contract: (1) contracts that expressly disavow money damages, *Holmes*, 657 F.3d at 1314; (2) agreements that are entirely concerned with the conduct of parties in a criminal case and that lack "an unmistakable promise to subject the United States to monetary liability," *Sanders*, 252 F.3d at 1334, 1336; and (3) cost-sharing agreements with the government, *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008); *see Holmes*, 657 F.3d at 1315 (discussing *Rick's* "unique cost-share agreement"); *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1327 (Fed. Cir. 2016) (describing *Rick's* agreement as "a special government cost-sharing agreement").

Where "relief for breach of contract could be entirely non-monetary," moreover, the court may require a demonstration that "the agreement[ ] could fairly be interpreted as contemplating monetary damages in the event of breach." *Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015). We will not lightly infer the premise of a Tucker Act claim, but "a fair inference will do." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003). This fair-inference inquiry, though similar to the money-mandating analysis for claims based on the Constitution, statutes, or regulations, is informed by the fact that contracts normally do not contain provisions specifying the basis for the award of damages in case of breach. *See Holmes*, 657 F.3d at 1314. The right to money damages is, in most instances, fairly implied.

*Holmes* is instructive on this point. The contracts at issue in that case were two settlement agreements of Title VII employment disputes. *Id.* at 1315–16. The Navy had agreed both to document in Mr. Holmes's Official Personnel

File that he had resigned for personal reasons and to expunge a fourteen-day suspension from his record. *Id.* Neither term involved a payment of money. *See id.* We nevertheless held that the Claims Court had jurisdiction over claims alleging their breach because the purpose of those terms "clearly was to prevent Mr. Holmes from being denied future employment based on his record" and, therefore, the agreements "inherently relate to monetary compensation" through their relationship to Mr. Holmes's future employment. *Id.* at 1316. We also found probative the absence of language in the agreements "indicating that the parties did not intend for money damages to be available in the event of breach." *Id.*

*Higbie* is a helpful contrast to *Holmes*. The contract at issue there was a boilerplate alternative dispute resolution agreement that "served to guide the mediation process." *Higbie*, 778 F.3d at 991, 995 n.1. The plaintiff there did not argue that the agreement created "any specific duty owed by the Government that applies particularly to him." *Id.* at 995 n.1. The agreement contained a non-disclosure provision and a remedy for its breach, the exclusion of statements made during mediation from unrelated proceedings. *Id.* at 994. We concluded that the agreement could not fairly be interpreted to contemplate money damages. *Id. Higbie* is consistent with *Holmes* because the non-monetary remedy provided in *Higbie*'s alternative dispute resolution agreement supplanted the general rule that most contracts contain implied rather than express provisions specifying the basis for an award of damages in case of breach. *See Holmes*, 657 F.3d at 1314.

Here, the PHAs' claim is based on a money-mandating source of substantive law: their ACCs with HUD. Each PHA's ACC contractually obligates HUD to pay the PHA its operating subsidy, as determined by HUD's formula, subject to reduction only on a pro rata basis where insufficient funds are available. *See* J.A. 119–21 (¶¶ 71, 77–78, 82). HUD's failure to reduce the PHAs' 2012 operating

subsidy on a pro rata basis breached this contractual obligation and caused monetary harm to those who received less than they were owed under their ACCs. *See* J.A. 121 (¶ 83). Because the PHAs' claim is based on a contract, they come "armed with the presumption that money damages are available, so that normally no further inquiry is required." *See Holmes*, 657 F.3d 1303. Further, the PHAs' ACCs do not fall into any of the three exceptions to this presumption, and neither party argues otherwise.[4]

The government's principal argument on appeal is that the ACCs cannot fairly be interpreted to contemplate an award of money damages because, "within the statutory scheme and the parties' contract itself, the PHAs do not have any reasonable expectation of ever being able to spend their subsidies free and clear of statutory restrictions." Appellant's Br. 17–18. The government relies on both *Lummi* and *NCMS*.

Like the Claims Court, we disagree. First, the government's argument is based on its incorrect view that the PHAs' claim "seeks larger, strings-attached Federal subsidies," which is "inherently *not* a cognizable claim for money damages" but rather one for equitable relief. *See* Appellant's Br. 23–24; *accord* Appellant's Br. 28. That premise is wrong. The ACCs contractually obligate HUD to pay the PHAs their operating subsidy (or their prorated operating subsidy if insufficient funds are available). *See* J.A. 127 (incorporating by reference HUD regulations in title 24 of the Code of Federal Regulations); J.A. 128 ("HUD shall provide annual contributions to the [PHA] in accordance with

---

[4]    The government argues that the Claims Court erred by treating these three exceptions as exhaustive of all situations in which money damages are unavailable. While there may be other kinds of contracts that do not give rise to a presumption that money damages are available, the government fails to identify them.

all applicable statutes, executive orders, regulations, and this ACC."); *see also* 24 C.F.R. § 990.115 (defining ACC as "a contract . . . whereby HUD agrees to provide financial assistance."). In other words, the ACCs expressly promise monetary compensation in return for the PHAs' continued operations. The government identifies "no language in the agreements indicating that the parties did not intend for money damages to be available in the event of breach." *See Holmes*, 657 F.3d at 1316. Unlike in *Higbie*, there is nothing in the contract that makes clear that some other form of remedy was expressly contemplated.

Second, the government's reliance on *Lummi* is misplaced. In *Lummi*, we held that the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA") was not a money-mandating statute because it did "not authorize a free and clear transfer of money." 870 F.3d at 1319. NAHASDA established an annual block grant program through which Indian tribes, like the Lummi Tribe, received direct funding from HUD to provide affordable housing to their members. *Id.* at 1315. NAHASDA bears some similarity to Section 9 of the Housing Act: (1) it requires HUD to make grants according to a multi-factored formula, (2) it specifies the activities on which grantee tribes may dispense their funds, and (3) it allows HUD to terminate, reduce, or limit a tribe's payments where the tribe fails to comply substantially with NAHASDA. *See id.*

The similarities between the two *statutory* schemes are irrelevant, however, to whether the Claims Court has jurisdiction over the PHAs' *breach of contract* claim. Indeed, after we dismissed the Lummi Tribe's action for lack of subject matter jurisdiction, *id.* at 1320, we subsequently clarified that the Lummi Tribe's breach of contract claim was outside the scope of our prior mandate. *See Lummi Tribe of the Lummi Reservation v. United States* (*Lummi II*), 788 F. App'x 717, 721 (Fed. Cir. 2019). We explained that the scope of our review in *Lummi* "was limited to Lummi's

claim under NAHASDA" and that resolution of its breach of contract claim "was not necessary to our conclusion[ ] that NAHASDA is not a money-mandating statute."[5] *Id.* at 721–22. Given that our holding in *Lummi* did not extend to the Lummi Tribe's breach of contract claim, we see no reason to extend it to the PHAs' claim here.

The government argues that there is no reason why the strings-attached nature of funds is a "paramount consideration" for statutes and yet "entirely irrelevant" for contracts "whose entire purpose is to apply that same non-money mandating statute." Appellant's Br. 24. But as we have already said, with regard to the money-mandating requirement, the Supreme Court and this court have long distinguished between claims based on statutes and claims based on contracts. *See Holmes*, 657 F.3d at 1313–14 (discussing, *e.g.*, *Eastport Steamship Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967)); *see also Eastport*, 372 F.2d at 1008 & n.7 (characterizing contract claims as falling under "another head of jurisdiction" from statutory claims). Further, the government glosses over the fact that contracts impose obligations on parties, for which damages are the default remedy upon breach. *Cf. Winstar Corp.*, 518 U.S. at 885 (plurality opinion) (explaining that "damages are always the default remedy for breach of contract"). That contractual provisions either are required by or incorporate governing regulations does not make those obligations any less contractual in nature. *See San Juan*, 391 F.3d at 1360.

Moreover, in *Lummi*, we explained that any claim for relief under NAHASDA "would necessarily be styled" as a claim for "larger strings-attached NAHASDA grants—

---

[5]    In *Lummi*, we also reviewed the Tribe's illegal exaction claim, which we found to be invalid on its face. 870 F.3d at 1319. Resolution of the Tribe's breach of contract claim was not necessary to this conclusion either. *See Lummi II*, 788 F. App'x at 722.

including subsequent supervision and adjustment—and hence, for equitable relief." 870 F.3d at 1319. By contrast, the PHAs' complaint makes clear that they seek compensatory damages for HUD's breach of contract and not equitable relief in the form of an order that the 2012 funding be redistributed or increased. *See* J.A. 119–21 (¶¶ 71, 81–82, Prayer for Relief).

The government insists that the true nature of the PHAs' claim is one that seeks larger, strings-attached operating subsidies. Indeed, the government urges that the "true object" of the PHAs' claim is strings-attached operating subsidies. Appellant's Reply Br. 2, 14. We disagree. In *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Supreme Court distinguished between compensatory damages, which "are given to the plaintiff to *substitute* for a suffered loss," and specific remedies, which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895. Despite the government's characterizations to the contrary, the PHAs seek a money damages equivalent to substitute for the loss they suffered when HUD breached the ACCs by reducing their operating subsidy on a non-pro rata basis. And they do not seek more than they were entitled to under the contract. Thus, the government is wrong. The PHAs do not seek "larger" subsidies; they simply seek to receive the amount HUD promised. We conclude that the true nature of the PHAs' claim is one for compensatory money damages and not equitable relief.[6]

---

[6]    In *Columbus Regional Hospital v. United States*, 990 F.3d 1330 (Fed. Cir. 2021), we rejected a similar attempt to characterize Columbus's breach of contract claims as equitable in nature and, therefore, outside the jurisdiction of the Claims Court. *Id.* at 1349–50. We explained that, unlike the plaintiffs in *Bowen*, Columbus only sought a monetary award (and not equitable relief), predicated on

At bottom, the distinction between this case and *Lummi* is straightforward. The government may implement statutorily mandated subsidy programs without employing contracts as a vehicle for doing so. If it takes that route, the government would rarely subject itself to suit under the Tucker Act by a potential recipient of such subsidies. If it chooses to employ contracts to set the terms of and receive commitments from recipients with respect to such subsidies, depending upon the terms of the contract and the circumstances of non-payment, the government may find itself subject to suit in the Claims Court for damages relating to an alleged breach.

Third, the government's analogy to *NCMS* fails because this case is distinguishable. In *NCMS*, we reversed a district court order transferring the case to the Claims Court. 114 F.3d at 202. NCMS filed suit after Congress appropriated $40 million for NCMS in the Department of Defense Appropriations Act for Fiscal Year 1994 ("1994 Appropriations Act"), but the Air Force obligated only approximately $24 million of the appropriated funds in its Cooperative Agreement with NCMS. *Id.* at 197–98. The district court viewed the case as a contract claim against the government, even though three of the four pleaded counts were "plainly based" on the 1994 Appropriations Act and the remaining claim requested "specific performance of the Cooperative Agreement between NCMS and the Air Force, a remedy that the Court of Federal Claims is not empowered to grant." *Id.*

We looked to the true nature of the claims asserted and determined that the transfer was improper. *See id.* at 202. As to NCMS's statutory claims, we explained that "NCMS

---

a nonfrivolous allegation of breach of contract. *Id.* at 1350. Like Columbus, the PHAs here only seek a monetary award predicated on a nonfrivolous allegation of breach of contract.

is seeking funds to which it claims it is entitled under a statute," and not "money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds." *See id.* at 200 (analogizing to *Bowen*, 487 U.S. 879). Further, the 1994 Appropriations Act restricted NCMS's uses of appropriated funds, thus contemplating "a cooperative, ongoing relationship between NCMS and the Air Force." *Id.* at 201. In light of these restrictions, we explained that, "even if NCMS is entitled to obtain access to the remaining [unobligated funds] on some terms," it seemed reasonably clear that a simple money judgment would not be an appropriate remedy. *Id.* Like our holding in *Lummi* about the Lummi Tribe's statutory claim, our discussion of NCMS's statutory claims is irrelevant to the PHAs' breach of contract claim.

As to NCMS's contract claim, we concluded that that the Claims Court could not grant the kind of equitable relief that NCMS sought. *Id.* at 202. Specifically, because the parties' Cooperative Agreement only obligated the Air Force to transfer approximately $24 million to NCMS, NCMS could only obtain the remaining appropriated funds "by supplementation of the Cooperative Agreement or by formation of a new agreement." *Id.* We explained that NCMS effectively sought relief to require the Air Force "to expand the existing contractual relationship or to create a new one to cover the remaining appropriated but unobligated funds." *Id.* By contrast, the PHAs' claim here seeks neither to expand their existing contractual relationship with HUD nor to create a new one. The PHAs rather seek compensation for HUD's breach of existing contractual obligations.

The government argues that *NCMS* is analogous because, "in addition to making requests for equitable relief, '[s]ome portions of NCMS's complaint suggest that NCMS seeks a naked money judgment.'" Appellant's Br. 32 (quoting *NCMS*, 114 F.3d at 201 (internal quotations omitted)). Not so. While we recognized that portions of NCMS's

complaint *suggested* that NCMS sought a naked money judgment, we determined that NCMS could only obtain what it wanted via injunctive relief. *NCMS*, 114 F.3d at 201 ("Other portions of the complaint, however, make clear that NCMS anticipates the need for injunctive relief . . . ."). Here, nothing in the PHAs' claim requires injunctive or equitable relief, remedies that the Claims Court generally lacks power to grant.

The government also argues that *NCMS* is analogous because the Cooperative Agreement in *NCMS* and the ACCs here "involve heavy use 'restrictions' and an 'ongoing relationship' with the Government." Appellant's Br. 31. But our conclusion—that "[i]n light of the restrictions governing the manner in which money may be allocated to NCMS and spent, it thus seems reasonably clear that a simple money judgment issued by the Court of Federal Claims would not be an appropriate remedy, *even if NCMS is entitled to obtain access to the remaining* [*unobligated funds*] *on some terms*"—was limited to NCMS's statutory claims. *See NCMS*, 114 F.3d at 201 (emphasis added). As we explained, NCMS could only obtain the unobligated funds contractually by supplementing its existing Cooperative Agreement or creating a new one. *See id.* at 202. Although we observed that the Cooperative Agreement reflected the 1994 Appropriations Act's ongoing relationship between NCMS and the government, our analysis of the use restrictions and ongoing relationship did not extend to NCMS's contract claim because NCMS could not obtain the unobligated funds on any terms under its existing Cooperative Agreement. Again, the PHAs do not seek to expand or alter their current contractual rights under their ACCs.

We turn now to the government's two remaining arguments on jurisdiction. First, the government argues that only equitable relief would make the PHAs whole and not overcompensate them. Specifically, the government asserts that this court "would have to specify which use

restrictions and Government rights would apply to any breach award in this case" so as "to give effect to the parties' agreement, and to give HUD the benefit of *its* bargain." Appellant's Br. 31. We do not agree that a money damages award would overcompensate the PHAs. The general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been had the breaching party fully performed its obligation. *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997). Here, had HUD performed its contractual obligation, the PHAs would have received their prorated operating subsidy and been subject to the use restrictions incorporated into the contract. They instead received less than their pro rata share, so compensatory damages of the difference places them in as good a position as they would have been had HUD fully performed its obligation under the ACCs. *See id.* That the PHAs would have been contractually bound to use their prorated operating subsidy in accordance with all applicable statutes and HUD regulations had HUD not breached is irrelevant to whether their money damages award compensates them for HUD's breach.[7]

Second, the government argues that merely requesting money damages under a contract is not enough to establish Tucker Act jurisdiction. We agree. *See, e.g.*, *NCMS*, 114 F.3d at 199; *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994). But our holding is not based solely on the relief requested in the PHAs' complaint. In addition to requesting

---

[7]    The government does not argue that the PHAs' compensatory damages award must be reduced on other grounds, *e.g.*, for additional costs that the PHAs would have incurred in performing their contractual obligations. *Cf. White v. Delta Constr. Int'l, Inc.*, 285 F.3d 1040, 1043 (Fed. Cir. 2002). Our holding here does not displace established principles about compensatory damages.

compensatory damages, the PHAs pleaded a non-frivolous claim based on a money-mandating source of law, their express contract with HUD. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (holding an allegation that an express or implied-in-fact contract underlay the claim "suffices to confer subject matter jurisdiction in the Court of Federal Claims"). As explained above, these ACCs do not fall into any of the three categories of contracts that we have recognized as exempted from the presumption that damages are available upon breach of contract. Clearly, the ACCs can fairly be interpreted as contemplating monetary damages in the event of breach. Thus, we hold that the Claims Court has jurisdiction over the PHAs' breach of contract claim.

## C. Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff's factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Because the Claims Court viewed the government's Rule 12(b)(6) argument as essentially the same as its jurisdictional argument, it disposed of them together. *Boaz*, 141 Fed. Cl. at 79, 85.

The government argues that the PHAs failed to state a claim because they are not legally entitled to a naked money judgment "for all of the reasons as discussed in detail" in its jurisdictional arguments. Appellant's Br. 40–41. Specifically, the government argues that the ACCs only contemplate purely non-Tucker Act remedies for obtaining a withheld operating subsidy because an unrestricted damages award would overcompensate the PHAs.

A court's jurisdiction and a claim's merits are generally distinct inquiries. *See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1306–07 (Fed. Cir. 2008) (explaining that the Supreme Court in *White Mountain Apache Tribe* "made clear that the merits of the claim were not pertinent to the jurisdictional inquiry"). On one hand, in Tucker Act cases, the jurisdictional inquiry is whether the plaintiff's well-pleaded complaint is grounded on a *money-mandating source. See Fisher v. United States*, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (en banc). In other words, "all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-man-dating source." *Jan's*, 525 F.3d at 1309; *see Fisher*, 402 F.3d at 1173 ("[T]he determination that the source is money-mandating shall be determinative . . . as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of ac-tion.").

On the other hand, the merits inquiry considers whether the plaintiff has established all *elements* of its cause of action. *Fisher*, 402 F.3d at 1175. Therefore, "the consequence of a ruling by the court on the merits, that plaintiff's case does not fit within the scope of the source, is simply this: plaintiff loses on the merits for failing to state a claim on which relief can be granted." *Id.* at 1175–76; *cf. St. Bernard Par. Gov't v. United States*, 916 F.3d 987, 991, 998 n.5 (Fed. Cir. 2019).[8]

---

[8]    In *St. Bernard Parish*, we noted that the Claims Court incorrectly characterized its dismissal as jurisdic-tional in nature, rather than as a dismissal for failure to state a claim on which relief can be granted. 916 F.3d at 998 n.5. The Claims Court dismissed on two bases: (1) the Cooperative Agreement did not contemplate money

Here, the government's argument that the ACCs only contemplate purely non-Tucker Act remedies is not pertinent to the merits issue of whether the PHAs have established all elements of their breach of contract claim. Rather, it restates the government's jurisdictional argument as to why the ACCs are not a money-mandating source. *See Higbie*, 778 F.3d at 993 (holding that, "if relief for breach of contract could be entirely non-monetary," it is "proper for the court to require a demonstration that the agreements could fairly be interpreted as contemplating monetary damages in the event of breach"). The government has not otherwise attacked the merits of the PHAs' claim—the existence of a contract, the terms thereof, or the failure of HUD to abide by the same. We therefore reject the government's argument as a basis to dismiss for failure to state a claim.

## III. CONCLUSION

We have considered the government's remaining arguments and find them unpersuasive. For the reasons discussed above, we affirm the Claims Court's denial of the government's motion to dismiss for lack of jurisdiction and failure to state a claim.

### AFFIRMED

---

damages and (2) the government received no consideration. *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017). The first basis is jurisdictional, while the second basis is on the merits.